Filed 12/23/14  In re S.C. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re S.C., a Person Coming Under the Juvenile Court Law. | B255612 (Los Angeles County Super. Ct. No. DK00319) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  ERIC C.,  Defendant and Appellant. | |

Appeal from orders of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge.  Affirmed.

Michele Anne Cella, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

*******

Father Eric C. (father) appeals the juvenile court's orders exercising jurisdiction over his seven-year-old daughter S.C. pursuant to Welfare and Institutions Code section 300[1] and removing S.C. from his custody pursuant to section 361, subdivision (c). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This appeal involves only father and S.C., although mother S.R. (mother) and S.C.'s two half-sisters, 14-year-old M.M. and 10-year-old D.M., who have a different father, were involved in the proceedings below. In an amended petition, the Los Angeles County Department of Children and Family Services (DCFS) alleged mother "inappropriately physically disciplined" D.M. by repeatedly striking her hands with sandals, pushing her, pulling her hair, and throwing her to the floor. On other occasions, she struck D.M.'s legs, arms, and hands with sandals. It was further alleged mother possessed marijuana in M.M.'s presence, within access of the children. Based on those facts, DCFS alleged all three children were at substantial risk of harm under section 300, subdivisions (b) and (j) (abuse or neglect of a sibling).

As to father, DCFS alleged he "has a history of illicit drug use and is a current abuser of amphetamine and methamphetamine, which renders the father incapable of providing the children with regular care and supervision. On 8/1/13, the father ha[d] a positive toxicology screen for amphetamine and methamphetamine. On 8/1/13 and on prior occasions in 2013 and 2012, the father was under the influence of amphetamine and methamphetamine while providing care and supervision of the child. The father's substance abuse endangers the child's physical health and safety, placing the child at risk of physical harm, damage and danger."

DCFS's initial investigation revealed support for the allegations against mother, as well as other facts related to mother's treatment of the children. D.M. reported sometimes mother had no food in the house, men smoked cigarettes in the middle of the

---

[1]    All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

night at mother's apartment, mother called D.M. "retarded" and used profanity in speaking to her, and mother did not provide her with clean clothes. M.M. reported being hit by mother with objects in the past. Mother told her she was going to do "weed" in the bathroom on several occasions, which M.M. understood was an illegal plant kept in a bag. Mother and her friends also sold "weed" on prior occasions. When M.M. was six years old, she saw mother using what she believed was an illegal drug and mother threatened to hurt her if she told anyone. M.M. even showed the interviewing social worker a video she claimed was taken by mother depicting a man snorting what appeared to be an illegal drug in mother's residence. M.M. also heard mother having sex with men in the apartment.

S.C. denied being corporally punished or being afraid of mother.

When interviewed, mother admitted hitting D.M. with the sandal, but denied she pushed her to the ground. She admitted a history of using drugs, but denied currently using them. She also denied she had anything to do with the video.

The children's maternal aunt claimed mother had used drugs for 10 years and her drug of choice was methamphetamine. She described prior occasions when she had discovered mother and a man using drugs at mother's apartment. At one point, she took D.M. to her house for three weeks and mother never called during that time to check on her. On the day mother hit D.M. with a sandal, the maternal aunt took the children because she thought mother was coming down from a "high."

DCFS had previously received multiple referrals involving mother, only one of which was substantiated involving mother's use of methamphetamine. Mother also had a misdemeanor conviction for domestic violence.

Father reported he and mother were never married and mother was S.C.'s primary caregiver. He and mother agreed to allow S.C. to visit him and the paternal grandparents on weekends, although he also made sporadic checks with mother about S.C.'s wellbeing. He knew mother had a history of using illicit drugs, including methamphetamine, but he did not believe she currently used them. He found out a few months earlier that S.C. was having academic difficulties, which led to an arrangement to allow S.C. to live with her

paternal grandmother, where her academic performance improved.  Father admitted having a criminal record for possession of illicit drugs and domestic battery, but he claimed he was never incarcerated and denied having a history of drug use.

In a test taken the day after he was interviewed, he tested positive for amphetamine and methamphetamine.

Following the filing of the section 300 petition, S.C. was removed from mother's and father's custody, with DCFS noting father "allowed [S.C.] to remain under the care of the mother even though he was aware that the mother was unable to meet the child's basic needs and care."  Father consented to the proposed plan of removal.

At the initial juvenile court hearing, the court ordered the children to be detained, mother's and father's visits to be monitored, and mother and father to submit to weekly drug tests.

In the combined jurisdiction and disposition report, DCFS reported father had a 1998 arrest for possession of a controlled substance for which he completed a court-ordered drug program and a 2008 misdemeanor conviction for spousal battery for which he served three days in jail and was placed on three years of probation.

In his interview, father reported he did not spank the children but allowed mother to enforce discipline and he had seen mother use a sandal on D.M. previously.  Because he had been living at the paternal grandmother's house in the few months prior to the children's detention, he was unaware of everything that went on in the house, although he was upset when he heard mother was having other men inside her apartment and the children had to see them coming and going.  He believed mother had been using methamphetamine at the time, and when she used, the children would often miss school or mother would forget to pick them up after school.

Father admitted using marijuana before taking his current drug test and he claimed he took a "clean out" in order to try to test clean.  He denied using methamphetamine and claimed the last time he had done so was three years ago.  He admitted starting to use in 1998, although he claimed he was still able to function and hold down a job.  He again admitted his prior substance abuse convictions and he had attended drug diversion

4

classes. He previously had a medical marijuana card, but he did not have a currently valid license. He claimed he did not use drugs in front of the children. When asked about his recent positive test for methamphetamine, he claimed mother had given him a beer that "tasted funny," and he believed mother purposely put methamphetamine in his beer because the children were detained from her and she did not want father to get custody. He admitted he drank beer occasionally after work but denied a drinking problem.

M.M. reported she had known father all her life and treated him like a "dad," even though he and mother were "off and on." She had always known he used "weed" and had seen him smoking it in their apartment and on the balcony. She said he had a chair in the corner he would sit in and smoke. D.M. had also told M.M. she had seen father "smoking weed." M.M. was not sure if he used any other types of drugs. M.M. also reported "everyday the house smell like marijuana," and she saw mother with marijuana.

D.M. reported father was like a "dad." She said father "smokes cigarettes on the balcony," but she was not sure if he used any other kinds of drugs.

S.C. reported she had learned about drugs in school, but she did not know anyone who used them or had ever seen what they look like. She said mother and father "smoke cigarettes on the balcony" and sometimes "they drink beer but they don't get crazy."

Mother reported she did not know that father was currently using until she heard the results of the drug test. She claimed he was not living with them before the children were detained, but he would come by to watch the children if mother asked. She said he had always been around and helped raise all of the children, even though she and father would often break up and get back together.

Maternal grandmother had concerns about father because he had "a lifestyle similar to [mother]." She said they were "like poison together," thought they used drugs together, and they constantly dated on and off. She said the children had previously told her they knew father would "go in the bathroom and smoke weed." She did not think father was an abusive person, but he was also not responsible to take care of the children. She said mostly the paternal grandmother cared for S.C. With regard to mother, maternal

5

grandmother thought she started using drugs when D.M. was born, and while she got clean, she recently relapsed before the children were detained. She said mother's house was very messy and the children would not be fed. She noticed mother's personality had changed and she did not work, instead staying home all the time. M.M. and D.M. told maternal grandmother mother would have men over until 4:00 or 5:00 a.m., and they thought they were using drugs.

Paternal grandmother was aware of father's history with drugs and she did not think it was good when he and mother resided together. She said father resided with her for about three months prior to the children being detained, but had since gotten back together with mother. She said father had told her he tested positive for methamphetamine but claimed he had not used it and it had been slipped into his drink. She also expressed concerns about the children being cared for in mother's home because S.C. was often late to school and mother did not pick her up after school. Paternal grandmother would also try to bathe and feed S.C. because she was not always clean with clean clothes.

Father was enrolled in weekly drug testing, but in the 12 weeks following his positive drug test, he failed to test nine times. He also failed to enroll in any programs. He claimed his failures were due to his work schedule and traveling out of town for work.

A multidisciplinary assessment team assessment noted S.C. had been subject to multiple traumas during her lifetime, including prenatal exposure to drugs during the first two months mother was pregnant with her and witnessing ongoing domestic violence between her parents, during which father used "bad language." She acknowledged her home environment made her "feel scared" at times.

At the initial hearing setting the matter for adjudication, father waived the reading of the petition and statement of rights. Before the adjudication hearing, DCFS submitted last minute information informing the court father had provided no information regarding the progress or enrollment in any programs and had missed three more drug tests.

Father did not appear at the adjudication hearing, but his counsel proceeded on his behalf and argued insufficient evidence supported the allegation against him. Counsel

6

noted the children did not see father smoke cigarettes on the balcony. Counsel also argued father explained he failed to submit to the drug tests because he traveled for work and he would not be using marijuana if he had to "driv[e] all over the state" for his job. Father denied using drugs in front of the children and he explained his positive drug test because he believed mother put something in his beer. While counsel acknowledged father had a history of marijuana use, counsel argued there was no evidence of a "nexus" between father's drug use and risk to the children. The children's counsel echoed father's counsel's argument that there was no "nexus" between father's drug use and risk to the children.

County counsel argued there was a nexus because father tested positive for methamphetamine, refused to submit to further tests, and had criminal convictions for substance abuse. Counsel also noted maternal grandmother said father would go into the bathroom and smoke "weed."

Before ruling, the juvenile court asked, "Were the kids primarily with [mother] versus [father]?" Mother's counsel responded, "Part of the time. [Father] did reside with the mother and the children."

The juvenile court sustained the allegations against mother and father. With regard to father, the court explained, "There is a long history of [father] using substance abuse [*sic*]. And although he completed the program back in 2000, there's information in the report that [father] was smoking maybe in the presence of the kids as late as August. [¶] There is a positive methamphetamine test and there has been no shows, consistent no shows and thereby not demonstrating sobriety. [¶] With respect to the nexus, the court notes that there is information about [father] smoking marijuana in front of the kids." It further noted there was evidence to suggest father knew mother was neglecting the children but he depended on her to care for them.

Finding reasonable efforts were made to prevent removal, the court declared the children dependents of the court and removed them from the parents' custody. The court ordered father to submit to drug and alcohol testing, to attend a full treatment program if

he had any missed or dirty tests, and to attend individual counseling to address his substance abuse.  He was granted supervised visitation.  Father timely appealed.

## DISCUSSION

### 1.  *Father Forfeited His Challenge to the Sufficiency of the Petition*

Father challenges the sufficiency of the allegations against him contained in the petition.  DCFS contends father forfeited this claim because he never raised this challenge in the juvenile court, he waived reading of the petition, and he chose to litigate the merits.  Although one older case rejected forfeiture (see *In re Alysha S.* (1996) 51 Cal.App.4th 393, 397 (*Alysha S.*)), we agree with *In re David H.* (2008) 165 Cal.App.4th 1626 (*David H.*) and other cases finding the failure to challenge the sufficiency of the petition in the juvenile court forfeits the challenge on appeal.

Without analysis, the court in *Alysha S.* cited Code of Civil Procedure section 430.80, which creates a rule in civil cases that "'"[i]f the party against whom a complaint or cross-complaint has been filed fails to object to the pleading, either by demurrer or answer, that party is deemed to have waived the objection unless it is . . . an objection that the pleading does not state facts sufficient to constitute a cause of action."'" (*Alysha S., supra*, 51 Cal.App.4th at p. 397.)  The court in *David H.* gave two reasons for refusing to extend that provision to dependency proceedings.  "First, [Code of Civil Procedure] section 430.80 appears in part 2 of the Code of Civil Procedure, which applies to civil actions, not part 3, which applies to special proceedings.  Thus, it does not even apply to juvenile dependency proceedings by its own terms." (*David H., supra*, 165 Cal.App.4th at p. 1640.)  "Second, the statute is inconsistent with the purposes of juvenile dependency law.  Allowing parties to challenge the facial sufficiency of a petition for the first time on appeal conflicts with the emphasis on expeditious processing of these cases so that children can achieve permanence and stability without unnecessary delay if reunification efforts fail.  [Citation.]  Enforcing the forfeiture rule requires parties to raise such issues in the juvenile court where they can be promptly remedied without undue prejudice to the interests of any of the parties involved." (*Ibid.*; see also *In re Christopher C.* (2010) 182 Cal.App.4th 73, 83 [following *David H.*'s reasoning]; cf. *In re*

8

*John M.* (2012) 212 Cal.App.4th 1117, 1123 (*John M.*) [citing *David H.* and noting, "In general, a parent may not challenge the sufficiency of allegations in a dependency petition on appeal if he or she did not raise the issue in the dependency court."].)

Father contends we should find an exception to forfeiture because his challenge to the sufficiency of the petition presents a question of law, which we may address in our discretion. (*In re Abram L.* (2013) 219 Cal.App.4th 452, 462.) But the cases cited above make clear that the argument is forfeited under these circumstances, even if it is a question of law. Moreover, accepting father's argument would allow the exception to swallow the rule. We decline to exercise our discretion to address his challenge.

### 2. *Substantial Evidence Supported the Jurisdictional Order*

Father contends there was no substantial evidence to support the assertion of jurisdiction over S.C. We disagree. """We review the juvenile court's jurisdictional findings for sufficiency of the evidence. [Citations.] We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible. [Citation.]" [Citation.] """The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record."""" (*John M., supra*, 212 Cal.App.4th at p. 1124.)

"Under section 300, subdivision (b), the juvenile court may assert jurisdiction over a child when '[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse. . . . The child shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness.' Thus, '[t]he three elements for jurisdiction under section 300, subdivision (b) are: "'(1) neglectful conduct by the

9

parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.'"" (*John M., supra*, 212 Cal.App.4th at p. 1124.)

The evidence of father's history of and current drug use, including his use around the children, amply supported the juvenile court's exercise of jurisdiction in this case.[2] Father admitted he used methamphetamine starting in 1998 and he obviously continued to do so given he tested positive for methamphetamine when the family came to the attention of DCFS. The juvenile court was free to disbelieve his claims he had not used methamphetamine in the prior three years and that mother had slipped methamphetamine into his beer, causing the positive test, especially because he failed to enroll in any programs and missed most of his drug tests, which the juvenile court could properly consider the "equivalent of a positive test result." (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217 (*Christopher R.*).) Father also had a 1998 arrest for possession of a controlled substance, and, despite completing a court-ordered drug program, he continued to use not only methamphetamine but also marijuana without a current license, suggesting a history of substance abuse. (See *Alexis E., supra*, 171 Cal.App.4th at p. 451 [father's use of marijuana before obtaining medical recommendation supported finding of history of substance abuse].)

Further, M.M. reported she knew father used "weed" and had seen him smoking it in their apartment and on the balcony. She was even able to identify the chair he used when he smoked. M.M. said D.M. told her she had seen father "smoking weed." M.M. also said the house smelled like marijuana everyday. Maternal grandmother said the children had previously told her they knew father would "go in the bathroom and smoke weed." Mother also openly had marijuana in the home, and maternal grandmother said father had "a lifestyle similar to [mother]" and they used drugs together, suggesting drug

---

[2]    Because we find these grounds sufficient, we need not address father's other contention no substantial evidence supported that he knew or had reason to know mother posed a risk to the children (which was not alleged in the petition as a ground for jurisdiction in any event). (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 (*Alexis E.*).)

10

use was prevalent in the children's home. While S.C. did not know anyone who used drugs and had not seen what they looked like, S.C. lived in the home, so the juvenile court could have reasonably inferred S.C. was exposed to father's marijuana use. Thus, "[t]he trial court could reasonably find that Father's use of marijuana constituted a risk of harm to the minors because of Father's failure to protect the minors from the marijuana smoke. While it is true that the mere use of marijuana by a parent will not support a finding of risk to minors [citations], the risk to the minors here is not speculative. There is a risk to the children of the negative effects of secondhand marijuana smoke." (*Alexis E., supra*, 171 Cal.App.4th at p. 452; see § 300.2 ["The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child."].)

DCFS notes there is some tension in the case law over how to define "substance abuse" in section 300, subdivision (b). But father does not contend he is not a substance abuser; instead, he argues there was no causal link between his substance abuse and harm to S.C.[3] As explained above, there was substantial evidence the children were exposed to his drug use, creating a substantial risk of serious physical harm supporting the exercise of jurisdiction. Moreover, given father used marijuana in the children's presence, this case does not fall within the line of cases finding a parent's drug use *alone* could not support jurisdiction. (See *Drake M., supra*, 211 Cal.App.4th at pp. 768-769; *In re David M.* (2005) 134 Cal.App.4th 822, 829-830; cf. *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1346 [for purposes of § 366.22, finding no evidence linked mother's marijuana and alcohol use to her parenting judgment or skills].)

---

**3** As a result, we need not decide whether S.C.'s age of seven fell within the "tender years" for which a "'finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of harm.'" (*Christopher R., supra*, 225 Cal.App.4th at p. 1219 [finding children six years old and younger were children of "'tender years'" to which rule applied]; see *In re Drake M.* (2012) 211 Cal.App.4th 754, 767 (*Drake M.*).)

11

### 3. *Section 361.2 Did Not Apply*

Father contends that, after ordering S.C.'s removal under section 361, the juvenile court erred in not applying section 361.2 to place S.C. with him because he was a noncustodial parent. Section 361.2, subdivision (a) states, "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." Thus, if the noncustodial parent wants a dependent child placed with him or her, the court must do so unless it finds clear and convincing evidence of detriment. (*In re John M.* (2013) 217 Cal.App.4th 410, 420.)

DCFS argues section 361.2 required father to be a "nonoffending" parent and he was not because the juvenile court sustained allegations against him under section 300, subdivision (b).[4] There is a split of authority over whether a noncustodial parent must be nonoffending for section 361.2 to apply. (Compare, e.g., *In re John M., supra*, 217 Cal.App.4th at p. 423 [requiring noncustodial parent be nonoffending] with *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 300-301 [rejecting nonoffending requirement].) We need not decide this question because father has not asked us to. Instead, he argues his case is *factually* distinguishable from *In re John M.* and other cases requiring a parent be nonoffending under section 361.2 because he was nonoffending, that is, "he had no involvement in the events leading up to the dependency case" and "he was named in the petition due to unrelated facts." (See *In re John M., supra*, at p. 425 [suggesting nonoffending means "a parent who had no connection with the circumstances

---

**4** DCFS does not argue father was not a noncustodial parent, despite mother's counsel statement to the juvenile court that father resided with mother and the children. We will therefore assume father was a noncustodial parent.

that brought the child within the jurisdiction of the court" [italics omitted].)  This is plainly incorrect.  The juvenile court exercised jurisdiction because it found father's drug use created a substantial risk of harm to S.C., which was alleged as a ground for removal under section 300, subdivision (b) and which was supported by substantial evidence, as we have concluded.

### 4. *Substantial Evidence Supported the Dispositional Order*

"Under section 361, subdivision (c)(1), a dependent child may not be taken from the physical custody of the parents with whom the child resides at the time the petition was initiated unless the juvenile court finds by clear and convincing evidence '[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody.'  (§ 361, subd. (c)(1).)  'The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home.  (§ 361, subd. (c)(1).)'  [Citation.]  '"The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate.  The focus of the statute is on averting harm to the child."  [Citation.]  The court may consider a parent's past conduct as well as present circumstances.  [Citation.]'  [Citation.]  We review a dispositional order removing a child from parental custody for substantial evidence."  (*John M., supra*, 212 Cal.App.4th at p. 1126.)  Father emphasizes the clear and convincing evidence standard, but "the substantial evidence test remains the appropriate standard of review, 'bearing in mind the heightened burden of proof.'"  (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.)

The evidence of father's drug use and his use of marijuana around the children discussed above constituted substantial evidence supporting the juvenile court's removal of S.C. from father's custody.  Father cites *In re Destiny S.* (2012) 210 Cal.App.4th 999 to argue the evidence was insufficient to support removal, but in that case the mother tested clean for three months and there was no direct evidence showing the child was at risk from smelling the mother's marijuana smoke "'not very much.'"  (*Id.* at p. 1004.)

13

Here, in contrast, there was direct evidence father regularly smoked marijuana in the home around at least two of the children, creating an inference S.C. was also exposed to it while living in the home, and he repeatedly missed his drug tests after testing positive for methamphetamine.  Although father argues his work schedule explained his missed tests, the juvenile court was free to discredit that explanation in light of father's drug history, his positive methamphetamine test, and the children's statements they were exposed to marijuana smoke.

Father also suggests the juvenile court should have placed S.C. with him rather than ordering her removed and he could have arranged for her care while he was away for work, analogizing to a parent in prison who may arrange for care of a child in his or her custody.  But the issue was not his inability to care for S.C.; it was the substantial risk of physical harm to S.C. from his substance use.  Therefore, whether or not he could arrange for care when he was away was not relevant to the juvenile court's determination.

## DISPOSITION

The juvenile court's jurisdictional and dispositional orders are affirmed.


FLIER, J.

WE CONCUR:



RUBIN, Acting P. J.



GRIMES, J.


14